IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
Case No.: 1:23-cv-20581-PAS

ADEL JOSE SABBAGH SOTERANO
    Petitioner,

v.

LUISELENA OROPEZA APONTE
    Respondent.
_____/

## ORDER ON PETITION FOR RETURN PURSUANT TO THE HAGUE CONVENTION

THIS MATTER is before the Court on a Verified Petition to Return Children to Venezuela, pursuant to the Hague Convention of the Civil Aspects of International Child Abduction ("the Convention"), and the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001 *et seq*. Petitioner, Adel Jose Sabbagh Soterano, ("the Father") seeks the return of his son A.S.O. and his daughter R.S.O (collectively "the Children") to Venezuela. DE 1. The Father alleges that the Respondent Luiselena Oropeza Aponte ("the Mother") wrongfully removed the Children. *Id*. The Father asserts that he was exercising custodial parental rights under Venezuelan law and the Convention and ICARA mandate the immediate return of his Children. *Id*. The Mother argues one of the Hague Convention exceptions apply, specifically that the Father was not exercising custodial rights, that the Children would be at risk of harm if they were to return, or because the Father's filing is untimely, the Children are well-settled and object to returning to Venezuela. DE 17 at 4-7.

The Court conducted a three-day evidentiary hearing from April 10, 2023 and through April 12, 2023. in which both sides presented testimony[1] and evidence, as well as

---

[1] At the three-day evidentiary hearing, the Mother, the Father, Dr. Miguel Firpi, a qualified child psychologist, and Dr. William Rafael Medina, a Venezuelan legal expert, testified.

1

*in camera* discussion[2] with the Children. The Court also conducted a status conference on April 19, 2023 following the Mother's April 13, 2023 immigration hearing. The Court considered the parties' pleadings, exhibits, testimony, arguments, proposed findings of facts and conclusions of law [DE 46; DE 47], the *in camera* discussion with the Children, and the parties' joint expert's evaluation of the Children. The expert's evaluation of the Children was stipulated to and submitted into evidence as Exhibit S.

## I. FINDINGS OF FACT

### a. The Parents' Relationship

The Children in this matter are the result of the Father's extramarital affair and have never lived with their parents as a family. The Father and Mother are both from Barquisimeto, Venezuela and have known each other for more than twenty years. DE 42 at 104:15; DE 43 at 92:11-13. The Father is fourteen years the Mother's senior. DE 43 at 92:15. The Father is a businessman,[3] and the Mother worked in her father's business in Venezuela. Ex. S at 3. The Father and Mother began an intimate relationship in 2004 which lasted about a year when the Mother was about twenty-one years old. DE 42 at 104:18; DE 43 at 93:14 – 94:4-5. The Father does not have children with his wife with whom he has been in a relationship with for about thirty-five years and married in 2008 or 2009. DE 42 at 104:20-22; DE 43 at 94:15. Despite the Father's marriage, the Mother and Father began a more "formal" relationship in 2010. DE 43 at 94:10. The parents never

---

[2] Dr. Firpi was present at the *in camera* discussion. A.S.O. is very comfortable speaking in English. A Spanish interpreter assisted the Court when communicating with R.S.O., who is more shy about speaking in English. However, R.S.O. became more comfortable as the discussion continued.
[3] The Father testified that he *used* to have a furniture and household appliance store which he had to close down. DE 42 at 125:23 – 126:5. The Father testified that he is currently self-employed in the same line of work. *Id.* However, it is unclear from the record what exactly the Father does currently, because he only testified to what he *used* to do for work, specifically buy home appliances from Miami, Florida that he would ship to Venezuela. *Id.* at 126:12-22. The Father does not frequently travel to the United States anymore. *Id.*

2

lived together when they both resided in Venezuela. Ex. S at 3. The Mother always lived with her parents. Ex. S at 3; DE 43 at 96:22-23.

Their first child, R.S.O., was born in 2014. DE 31 at 6. Their second child, A.S.O., was born in 2016. *Id.* There is no dispute that they are the natural parents of the Children. *Id.* at 4. Under Venezuelan law, unmarried parents living in separate households have equal parental rights and responsibilities. DE 43 at 78:11-14.

The parents' relationship experienced many ebbs and flows. There is no evidence to suggest that the parents' relationship status impacted the Father's time or contact with the Children. However, if the Father was "unhappy" with the Mother, he would refrain from bringing groceries and other items to the Children. DE 43 at 101:23-25. The relationship between the two became increasingly more tense and the Father became verbally abusive with the Mother. DE 44 at 75:17. The maternal grandmother forbade the Father from entering their home in Barquisimeto because of how poorly the Father treated the Mother. Ex. S at 7. The Father installed a GPS tracking device on the Mother's car in 2012 without her knowledge. DE 43 at 9:2-5. The Father testified that the tracking device was for "safety." DE 42 at 174:20-21. However, the Mother believed it was the Father's attempt at controlling her whereabouts. Ex. S at 8. The Father would appear at locations where the Mother already was and would ask who she was with. DE 44 at 10:20-22. At one point, the Father sent the Mother a picture of various guns, and told the Mother he understood why a man would kill his partner. *Id.* at 17:8-10; 91:5-8. The Mother became fearful that the Father would kill her. *Id.* at 91:7-8. A few months before the Mother and Children left Venezuela, she and the Father were no longer in a relationship. *Id.* at 91:15.

### b. Children's Life in Venezuela from 2014 to 2021

The Children were both born in Barquisimeto, Venezuela and lived there until around July 8, 2021. DE 31 at 6; DE 46 at ¶ 3; DE 47 at 2. In Venezuela, the Children

3

always lived with their Mother and their maternal grandparents. DE 43 at 102:21-23. The Father materially supported the children by paying for food, clothing, school, health insurance, and after school activities. DE 46 at ¶ 5. The Children saw their Father frequently. The Father took A.S.O. to baseball practice a few times. DE 42 at 60:7-11. The Mother took A.S.O. to baseball practice most of the time. Ex. S at 6. The Father took the Children horseback riding once. DE 42 at 60:7-11. The Children were too young to participate in other extracurricular activities. *Id.* at 124:20-22. The COVID-19 pandemic also limited the types of activities the Children could participate in. *Id.* at 41:3-10.

The Mother dropped off the Children at school every day. DE 44 at 7:2-4. The Father would pick the Children up from school, but not every day. DE 42 at 125:17. When the Children spent time with their Father after school, it was usually spent at the Father's apartment or their paternal grandmother's home. *Id.* at 109:25-120:2. When the Children were with their Father, he cooked for them, bathed them, and spent quality time with them. DE 44 at 65:24. The Father did not help the Children with their homework. Ex. S at 23. The Children always returned to their Mother's house around 8:00 or 9:00 p.m. DE 42 at 171:18. The Children stayed with their paternal grandmother for one week when the Mother went to Caracas, Venezuela, and in that timeframe the Father only spent two nights with the Children. Ex. S at 6. Other than that occasion, the Children never spent an overnight with their Father. *Id.* The Father never sought to formalize a custody arrangement with the Mother, and was in agreement with the way the time was spent when the Children were in Barquisimeto. DE 42 at 172:6-16.

The Father's apartment where he spent time with the Children is not his home where he lives with his wife. *Id.* at 167:6. The Children did not have any personal belongings in the Father's home. *Id.* The Children have never stepped foot inside their Father's marital home. DE 46 at ¶ 11. The Children have never met their Father's wife—

4

not in Venezuela, nor during the three-day evidentiary hearing in Miami, Florida, although the Father's wife travelled to Florida during the pendency of this matter. Instead, the wife went to Orlando, Florida to be with her family. DE 42 at 156:19-25. The Father explicitly asked his wife not to attend the in-court hearings "to avoid any sort of issues." *Id.* at 157:4-6. The Father recognizes that his Children do not have a relationship with his wife. *Id.* at 160:6-11. The Father never entertained divorcing his wife. DE 45 at 6:13-16. In fact, the Father believes that the Mother removed the Children from Venezuela because he refused to divorce his wife. Ex. S at 4. The Father, however, disallowed the Mother from pursuing romantic relationships outside of their relationship, "because she was in a relationship with me."[4] DE 42 at 181:2-19. The Mother admitted that she wanted the Father, the Children and herself to live together as a family. DE 44 at 69:18-24.

### c. The Mother and Children go to the United States

On June 17, 2021, the Mother purchased airline tickets for herself and the Children to fly to Mexico through Panama for the stated reason of going on vacation from July 8, 2021 until July 23, 2021. DE 44 at 24:7-10; DE 46 at ¶ 12. The Mother needed an executed and court-approved travel authorization permit to take the Children to Mexico. DE 44 at 24:18. Under Venezuelan law, both parents must consent to their children's travel outside of Venezuela. DE 43 at 67:14-15. The Mother did not speak to the Father regarding the travel authorization permit, nor did she tell the Father about the upcoming travel. DE 44 at 30:12; 57:10-17. The Mother hired an attorney to prepare the travel documents. *Id.* at 24:21-22. The Mother provided the attorney with the Father's information, the dates of travel, the Children's birth certificates, her identification, and the Father's identification to prepare the travel authorization permit. *Id.* at 25:14 – 26:25. The Mother picked up the

---

[4] The Father further testified, "If [the Mother] has a relationship with me, I'm going to allow her to go out with another guy? How would that work?" DE 42 at 180:22-23.

executed travel authorization permit at the attorneys' office. *Id.* at 27:16. The executed travel authorization permit was filed with a Venezuelan court on June 22, 2021. DE 1-8; DE 42 at 133 at 18-19. The Father denies signing any travel documents authorizing the travel. DE 42 at 134:14.

The Mother left her home in Barquisimeto on July 6, 2021 after her home was shot at and graffitied with a threatening message due to her political activities.[5] DE 44 at 33:10-15. The Mother took the Children to her brother-in-law's home out of fear of retaliation. *Id.* at 33:12-14. The Mother returned briefly to her home to retrieve some clothing. *Id.* at 33:18. As such, the Children's last day in their Barquisimeto home was July 6, 2021. The Mother did not tell her own mother that she was leaving Venezuela. Ex. S at 9.

The Mother and Children did, in fact, leave Barquisimeto to travel to Mexico through Panama on July 8, 2021. DE 44 at 34:16-22. While in Mexico, the Mother decided to cross the border into the United States of America with the Children. DE 44 at 34:23 – 35:2. The Mother and the Children entered the United States by crossing the Rio Grande through Texas on July 11, 2021. *Id.* at 35:16; 114:10-11. The Mother lost her phone during the crossing. *Id.* at 37:5-10. They spent two nights at a United States' border patrol shelter before being transported to a family shelter in Texas. *Id.* at 35:18-25. They were in the family shelter for twelve days, when the United States Citizenship and Immigration Services contacted the Mother's sister, who purchased the tickets for the Mother and Children to fly to Miami, Florida. *Id.* at 36:11-14. The Mother and Children arrived in Miami on July 23, 2021. *Id.* at 36:17. The Children communicated with their Father a few days after arriving in Miami. *Id.* at 38:25. The Children have maintained contact with

---

[5] The Mother testified to being affiliated with a political group that opposes the Venezuelan government. DE 44 at 19:22 – 21:6. As "an opposition member," the Mother attended demonstrations and worked at the local voting center. *Id.*

6

their Father since arriving in Miami. DE 42 at 42:8-11. There is no evidence to suggest the Mother has attempted to conceal the Children's location, nor has she inhibited communication between the Father and the Children.[6]

### d. The Father's Actions after the Children's Removal

The last day the Father saw his Children was on July 4, 2021, when they celebrated R.S.O.'s seventh birthday. DE 42 at 127:23-25. The Mother did not speak to the Father regarding the travel at the birthday party. DE 44 at 57:10-17. On July 7, 2021, the maternal great-grandmother called the Father asking where the Mother and Children were. *Id.* at 129:10-16. It was at that moment that the Father learned that his Children left Barquisimeto. *Id.* In the days after the Mother and the Children left, the Father spoke on the phone with A.S.O., who said they would return "Monday." *Id.* at 129:21-23. On July 14, 2021, after the Children did not return "on Monday," the Father initiated legal proceedings in Venezuela against the Mother, accusing her of falsifying the travel authorization permit. DE 1-9 at 4; DE 42 at 132:15-25. After an investigation, the Venezuelan court determined the travel authorization permit was forged and instituted criminal proceedings against the attorney who prepared the travel authorization permit. DE 1-9 at 6, 23. As a result of this incident, the guidelines in Venezuela have changed so now the judges issuing a minor child's exit visa must personally identify the parents. DE 43 at 67:8-11. After receiving the results of the investigation, the Father immediately began working with an attorney to understand what he had to do to see his Children again.

---

[6] The Mother's family, however, clearly does not foster the Children's relationship with the Father. During the three-day evidentiary hearing, there was an altercation between the Father and the maternal aunt, who reportedly was attempting to listen in on the Father's conversation with R.S.O. DE 43 at 53:1-21. This incident upset R.S.O. *Id.* After this point, the Court directed that the extended family members abstain from attending the remainder of the evidentiary hearing. *Id.* at 86:2. Thereafter, the Father was able to happily spend time with his Children in Miami.

DE 42 at 141:16-21. The criminal proceedings against the Mother are pending because she has not been served. DE 43 at 72:20-22.

On November 21, 2021, the Father filed his Petition for Return with the Venezuelan Central Authority. DE 1-10; DE 46 at ¶ 18. His Petition was not transmitted to the United States Department of State until March 2022. DE 46 at ¶ 20. On November 17, 2022, the United States Department of State sent a letter to the Mother, putting her on notice of the proceedings. DE 1-11. On February 13, 2023, the Father filed the instant action, seeking the return of the Children to Venezuela.

### e. The Mother and Children's Life in Miami, Florida

Since their arrival in Florida, the Children have been enrolled in a charter school. DE 46 at ¶ 27. The Children are doing well in school. DE 44 at 39:9 – 42:16. The Children are learning English. They both participate in extracurricular activities. R.S.O. attends dance classes, and A.S.O. attends jiu-jitsu and breakdancing classes. DE 46 at ¶ 26. The Mother pays for the Children's extracurricular activities. DE 44 at 45:4-5. The Children see doctors regularly and have health insurance. *Id.* at 49:3-9.

The Children live with their Mother and five other family members[7] in a three-bedroom house with an attached garage. DE 46 at ¶ 25. The Mother and R.S.O. live in the converted garage and A.S.O. shares a room with his adult uncle who is developmentally delayed. DE 44 at 60:17-19; Ex. S at 5. The Mother's sister is pregnant, and when she gives birth the Mother and the Children will have to find housing elsewhere. DE 44 at 60:15-25. The Mother works at a cookie factory in the packaging department, where she makes approximately $1,600 to $1,700 every two weeks. *Id.* at 57:21; 59:13. The Father has not provided any financial support since the Children's arrival in the United States and

---

[7] The Mother and Children live with a maternal aunt, her husband, their two young children, and a maternal uncle. Ex. S at 11.

testified that he has not done so because of his disagreement with the Mother's actions. DE 42 at 140:5-11. Neither the Children nor the Mother have asked the Father for financial support while in Florida. *Id.* at 150:12-15. The Mother has applied for political asylum. DE 44 at 51:2-6. She currently has a work permit. DE 42 at 45:18-19. The Mother's initial hearing date of April 13, 2023 was continued until June 13, 2024. DE 45 at 4:17.

The Mother has no intention of going back to Venezuela. First, the Mother fears political persecution due to her affiliation with the political party that opposes the Venezuelan government. DE 44 at 121:11-16. Second, the Mother cannot return to Venezuela due to her pending asylum proceedings. *Id.* at 51:2-6. Third, the Mother is afraid of going back to Venezuela because of the pending criminal proceeding against her which the Father initiated. *Id.* at 121:11-16. Lastly, the Mother does not want to go back to Venezuela because she is fearful of the Father's possessiveness, who admitted that he does not allow the Mother to pursue another romantic relationship. DE 42 at 181:2-11; DE 44 at 91:9-12.

### f. The Children's Emotional Connection with Their Parents

The parties mutually agreed to have the Children evaluated by a qualified psychologist, Dr. Miguel Firpi. To prepare his report, Exhibit S, Dr. Firpi interviewed the Mother, the Father, the Father's wife, and visited the Children's home in Miami. DE 42 at 37:5-39:16. Dr. Firpi also spoke to the Children's teachers and coaches. *Id.* at 55:16-17. Dr. Firpi's evaluation focused on whether the Children are well-settled in their new environment, whether they would suffer psychological or physical harm if returned to the Venezuela, and whether the Children are mature enough to express objections to return. *Id.* at 54:20-25. To determine whether the Children are well-settled, Dr. Firpi evaluated whether the Children have support, structure, routine, and their level of engagement in the community or school. *Id.* at 55:14-22. Dr. Firpi observed the Children with the Mother's

large family. *Id.* at 29:1-3. Dr. Firpi described the Mother's extended family as a "tribe," and noted that the extended family members are very close with the Children and involved in their lives. *Id.* at 56:9-19. In addition to their family in Miami, the Children have extended family members in Orlando, Florida; Boston, Massachusetts; and North Carolina. *Id.* Based upon his interviews, review of the records, research and expertise, Dr. Firpi concluded that the Children are very happy and well-adjusted in Miami. *Id.* at 56:4-8.

Dr. Firpi does not believe there is a "secure attachment" with their Faither. *Id.* at 48:21-23. Dr. Firpi testified that he observed a phone conversation between the Father and the Children. *Id.* at 64:11-13. The Father's interactions with the Children were more "parent-centric" than "child-centric," meaning the Father focused more on how this matter has affected him instead of trying to emotionally connect with the Children. *Id.* at 63:2-25. Dr. Firpi testified that the Father is not "emotionally attuned" to the Children. *Id.* at 52:10-18. The Children say they do not want to talk to their father because "it's always the same thing." *Id.* at 64:1. Dr. Firpi noted that although the Father complains that the Children do not respond when he calls, the Children likewise complain that at times, the Father does not respond when they call. *Id.* at 42:4-7.

Dr. Firpi testified that the Mother is emotionally bonded with the Children. *Id.* at 46:19-23. Dr. Firpi determined the Mother was nurturing and attentive. Ex. S at 19. Dr. Firpi also observed that the Children were affectionate with the Mother and listened to her instructions. *Id.* The Mother is aware of the Children's needs. For example, the Mother expressed to Dr. Firpi that A.S.O. can be hyperactive and asked him for guidance on how to manage the hyperactivity. DE 42 at 85:14-17. Dr. Firpi concluded that for the Children to leave the Mother to be with the Father and his wife would be a "severe adjustment" for the Children. *Id.* 79:5-10.

Dr. Firpi's report, in conjunction with the record evidence, indicates that the Children do not have an emotional connection whatsoever with the Father's wife because they have not met her. Ex. S at 23. The parents disagree on why the Children have not met the Father's wife— either the Mother or the wife forbade the Children from entering the Father's home. *Id.* at 7. The wife told Dr. Firpi that she had "no objection" to welcoming the Children into her home. *Id.* Likewise, the Father testified that the wife would welcome the Children. DE 45 at 14:8-14. The wife admitted to Dr. Firpi that the situation amongst the Mother, the Father, and the Children was "extremely difficult" but that she has "found God and acceptance." Ex. S at 7.

There is no dispute that the Mother is the primary caretaker. DE 42 at 64:2. The Children have essentially never been apart from their Mother. The Father does not want to separate the Children from their Mother and the Children, and understands the Children would not be happy if separated from their Mother. *Id.* at 160:20-21. However, other than to say he has room in his marital home, and that the Children will be able to participate in activities similar to the ones they are currently participating in, he has not provided a concrete plan to integrate the Children into his life in Venezuela, if they were to be returned. DE 42 at 159:19 – 160:5; DE 45 at 16:16 – 20:12.

In Dr. Firpi's discussion's with R.S.O., he observed a depth of thought that is not characteristic of an eight-year old. DE 42 at 81:7-9. For example, Dr. Firpi noted how focused she is on continuing her dance, and she recognizes that pursuing her passion depends on her behavior. *Id.* at 80:15. R.S.O. is self-aware and understands her difficulty with English is because of her shyness, but she expresses an intent to work on it. *Id.* at 80:15-17.

R.S.O. expressed that she does not want to return to Venezuela because she will not have the same opportunities. DE 43 at 45:20 – 46:7. R.S.O. expressed that she feels "better

11

with [the Mother]," and "not as well with [her Father.]" *Id.* at 52:4 – 6. A.S.O. also expressed an objection to returning to Venezuela. *Id.* at 22:24 – 23:6. A.S.O. stated that his favorite thing to do outside of school is "live with [the Mother.]" *Id.* at 8:5.

## II.   LEGAL STANDARD

The Convention's purpose is to "address the problem of international child abductions during domestic disputes." *Lozano v. Montoya Alvarez*, 572 U.S. 1, 4 (2014) (quotations omitted). The Convention does not empower the Court to make any determination regarding the underlying custody dispute. 22 U.S.C. § 9001(b)(4). The Convention's two primary objectives are first, to secure the prompt return of children wrongfully removed, and second, to respect a Contracting States' custody rights laws in another Contracting State's territory. *Id.* (quoting Hague Convention, Oct. 25, 1980, art. 1, T.I.A.S. No. 11,670, 19 I.L.M. 1501). The Convention requires the prompt return of a child wrongfully removed or retained away from the country in which he or she habitually resides. *Monasky v. Taglieri*, 140 S. Ct. 719, 723 (2020). However, the Convention also recognizes certain narrow exceptions to return. *Id.*

When a petition under the Convention is filed, the first question a court must address is whether the removal or retention was wrongful. The removal or retention is wrongful if it: (i) violates one of the parent's custody rights provided by the laws of the child's country of habitual residence; and (ii) the parent was actually exercising those custody rights at the time of removal or retention, or would have been exercising them, but for the removal or retention. Hague Convention, art. 3. If the petitioner shows by a preponderance of evidence that the removal or retention was wrongful, the burden shifts to the respondent to prove by a preponderance of the evidence that an affirmative defense applies. 22 U.S.C. § 9003(e). If a respondent is asserting the affirmative defense that a child is at grave risk of harm if they are to return to their country of habitual residence, the

12

evidence must be clear and convincing. *Golan v. Saada*, 142 S. Ct. 1880, 1888 (2022). Even if an affirmative defense applies, a court may exercise its discretion when deciding on a child's return. *Fuentes-Rangel v. Woodman*, 617 F. App'x 920, 922-23 (11th Cir. 2015) (quoting *Friedrich v. Friedrich*, 78 F.3d 1060, 1067 (6th Cir. 1996)).

### III. CONCLUSIONS OF LAW[8]

#### a. The Father Established a *Prima Facie* Case Under the Convention

Given the record, the Father has established by a preponderance of the evidence that he was exercising his custodial rights under Venezuelan law[9] at the time of the Children's removal. The Mother did not present any evidence to the contrary. Under Venezuelan law, parents of minor children, regardless of their relationship status, share equal parental rights and responsibilities. DE 34 at 6. It is clear from the evidence that Barquisimeto, Venezuela was the Children's habitual residence prior to their removal. The Father's name is on the Children's birth certificates. DE 42 at 105:18 – 106:18. The Mother does not dispute that he is the natural father of the Children, nor does she dispute that he was involved in the Children's lives while they lived in Venezuela. Although there is no judicial or written formal custody agreement between the Parents in this matter, neither side disputes that the Father was acting as a father to the Children— he supported them financially, spent time with them, spoke to them on the phone, and genuinely loves them. In this way, the Father was exercising his custody rights at the time of the Children left Venezuela. The Father did not approve, consent to, or in any way authorize his Children's

---

[8] The parties have stipulated to, and the Court agrees, that this Court has jurisdiction over this case under 22 U.S.C. § 9003(b) and 28 U.S.C. § 1331 and that venue is proper in the Southern District of Florida because the Children are currently in Miami, Florida. DE 31 at 6. Additionally, there is no dispute that the United States and Venezuela are signatories to the Convention, and that the Children are under the age of sixteen.

[9] The parties stipulated to the statements in the Father's Venezuelan legal expert's affidavit regarding Venezuelan law on parental rights and responsibilities. DE 34; DE 42 at 93:18-21.

travel to Panama, Mexico, and much less the United States. As such, when the Mother left Barquisimeto with her Children without the Father's consent, she wrongfully removed them from their habitual residence in violation of the Father's rights.

### b. The Father Filed the Petition More Than One Year After the Children's Removal

If a petition is filed more than a year after a child's removal, a respondent who asserts the well-settled defense to return under Article 12 must show by a preponderance of the evidence that the child is now well-settled. *Fernandez v. Bailey*, 909 F.3d 353, 359 (11th Cir. 2018). Here, it is clear from the evidence that the Father's petition is filed more than one year after the Children's removal. The Father filed his petition for the return of his Children with the appropriate Venezuelan authority approximately four months after the Children were removed. However, due to administrative delays exacerbated by the coronavirus pandemic, his petition was not forwarded and subsequently processed by the United States Department of State until October 2022. The instant Petition for Return was filed in February 2023, approximately a year and a half following the Children's removal. The one year-period begins from the date of the child's wrongful removal, and equitable tolling is not available under the treaty. *Lozano*, 572 U.S. at 15-17.

### c. The Children Are Well-settled

A respondent satisfies the well-settled exception under the Convention if he or she can show by a preponderance of the evidence that the child has developed a "stable, permanent, and non-transitory life" in their new environment. *Fernandez*, 909 F.3d at 361. The Mother has a steady job. Her family provides emotional and financial support, as well as stable housing. The Children are enrolled in school and extracurricular activities about which they are passionate. They are learning English quickly. During the Court's *in camera* discussion, A.S.O. was very comfortable speaking in English. R.S.O. was shy, however she

14

eventually became more comfortable and tried her best to communicate in English. Based on the *in camera* discussion, the Court can see that the Children are bright and aware of the tension between their parents.

The Children have experienced instability in their lives, by way of leaving their town in Venezuela, crossing into the United States, and spending time at a border shelter. DE 44 at 35:16-25. However, there has been one constant in their lives— their Mother. The Children have never been separated from their Mother. In Venezuela, they lived with and spent every night with their Mother, except for the one week they spent with their paternal grandmother when the mother was in Caracas. Ex. S at 6. In the United States, the Children live with and are cared for by their Mother. If the Children were to return to Venezuela, they would return to a familiar town but to a foreign living situation— a house they have never lived in with a stepmother they have never met while physically separated from their Mother.

The Father, who successfully kept his worlds separate when the Children lived in Venezuela, would assume full-time custodial parenting responsibilities, something he has never done. Much, if not all, of the care of the Children was delegated to two women in his life— the Mother and his mother. Although the Father can provide for his Children financially, the undisputed record evidence shows that he is not skilled at emotionally connecting with the Children. The Father is only accustomed to acting as a parent in a compartmentalized structure. Granting the Father's Petition would not restore the *status quo* for the Children, as is intended by the Convention. *Lops v. Lops*, 140 F.3d 927, 937 (11th Cir. 1998) (citing *Friedrich v. Friedrich*, 78 F.3d 1060, 1067 (6th Cir. 1996)). In fact, it would result in exactly the opposite. The Father wishes for things to return as they once were— the Mother providing primary care supplemented by the Children's grandparents in Venezuela. However, it is clear from the record that because the Mother's asylum

proceedings, the open criminal case against her, and her strained relationship with the Father, the Children's living situation will not return to what it once was. The Mother is adamant that she will not return to Venezuela.

### d. The Mother's Additional Affirmative Defenses

The Mother asserts two additional affirmative defenses— first, that the Father was not exercising his custodial rights, and second, that the Children will be exposed to grave psychological harm if returned to Venezuela. The first affirmative defense is without merit. The parties stipulated to what the Venezuelan law is regarding parental rights of unmarried parents and based on the evidence presented, the Father was exercising his custodial rights. Because the Children are well-settled in their new environment, it is not necessary to determine whether the Mother met the high burden of showing that the Children would be exposed to grave psychological risk if returned.

## IV. CONCLUSION

This is a distressing case. Given the undisputed opinion of the parties' joint expert witness, it is frustrating that two competent adults who obviously love their wonderful and well-settled Children cannot work out a rational plan so that the Children can continue to have a relationship with their Father while not separating them from their Mother, that the Father insists that he does not want to do. Further, while it is unquestionable that Venezuela is the appropriate forum to address the custody dispute between the parents, neither party has made an effort to do so. This Court is not authorized to make that determination. The parents' refusal or inability to reach a custody resolution, even when urged by the Court at the conclusion of the evidentiary hearing, reflects that the parents cannot put their Children's interests before their individual motivations.

The Father has established a prima facie case for return. However, because the Father's petition was not filed within a year of removal and the Mother has met her burden

16

in showing that the Children are well-settled in their new environment and prefer to live with their Mother, the Court must deny the Petition. Accordingly, it is

ORDERED THAT Petitioner's Petition for Return is DENIED.

DONE and ORDERED in Miami, Florida on this 2nd day of June, 2023.

PATRICIA A. SEITZ
UNITED STATES SENIOR DISTRICT JUDGE

cc: Counsel of Record